PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CoStar Group, Incorporated;
Costar Realty Information,
Incorporated,

*Plaintiffs-Appellants,*

v.

Loopnet, Incorporated,

*Defendant-Appellee.*

BMG Music; EMI Music, North
America; Sony Music
Entertainment, Incorporated;
Universal Music Group; Univision
Music, LLC; Columbia Pictures
Industries, Incorporated; Metro-
Goldwyn-Mayer Studios,
Incorporated; Paramount Pictures
Corporation; Twentieth Century
Fox Film Corporation; Universal
City Studios, LLLP,

*Amici Supporting Appellants,*

No. 03-1911

BELLSOUTH TELECOMMUNICATIONS,
INCORPORATED; NETCOALITION; EBAY
INCORPORATED; COMPUTER &
COMMUNICATIONS INDUSTRY
ASSOCIATION; GOOGLE INCORPORATED;
YAHOO! INCORPORATED; AMAZON.COM,
INCORPORATED; UNITED STATES
INTERNET SERVICE PROVIDER
ASSOCIATION; VERIZON
COMMUNICATIONS, INCORPORATED;
U.S. INTERNET INDUSTRY
ASSOCIATION,
                 *Amici Supporting Appellee.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CA-99-2983-DKC)

Argued: May 6, 2004

Decided: June 21, 2004

Before NIEMEYER, MICHAEL, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Michael joined. Judge Gregory wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Jonathan D. Hacker, O'MELVENY & MYERS, L.L.P., Washington, D.C., for Appellants. Kurt B. Opsahl, PERKINS COIE, L.L.P., San Francisco, California, for Appellee. Bruce G. Joseph,

WILEY, REIN & FIELDING, L.L.P., Washington, D.C., for Amici Supporting Appellee. **ON BRIEF:** Walter Dellinger, O'MELVENY & MYERS, L.L.P., Washington, D.C., for Appellants. Kenneth B. Wilson, PERKINS COIE, L.L.P., San Francisco, California, for Appellee. Paul B. Gaffney, Joseph M. Terry, Manish K. Mital, WILLIAMS & CONNOLLY, L.L.P., Washington, D.C., for Amici Supporting Appellants. Scott E. Bain, WILEY, REIN & FIELDING, L.L.P., Washington, D.C., for Amici Supporting Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively "CoStar"), a copyright owner of numerous photographs of commercial real estate, commenced this copyright infringement action against LoopNet, Inc., an Internet service provider, for direct infringement under §§ 501 and 106 of the Copyright Act because CoStar's copyrighted photographs were posted by LoopNet's subscribers on LoopNet's website. CoStar contended that the photographs were copied into LoopNet's computer system and that LoopNet therefore was a copier strictly liable for infringement of CoStar's rights under § 106, regardless of whether LoopNet's role was passive when the photographs were copied into its system.

Relying on *Religious Technology Center v. Netcom On-Line Communications Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995), the district court entered summary judgment in favor of LoopNet on the claim of direct infringement under § 106. We agree with the district court. Because LoopNet, as an Internet service provider, is simply the owner and manager of a system used by others who are violating CoStar's copyrights and is not an actual duplicator itself, it is not *directly* liable for copyright infringement. We therefore affirm.

I

CoStar is a national provider of commercial real estate information, and it claims to have collected the most comprehensive database of

information on commercial real estate markets and commercial properties in the United States and the United Kingdom. Its database includes a large collection of photographs of commercial properties, and CoStar owns the copyright in the vast majority of these photographs. CoStar makes its database, including photographs, available to customers through the Internet and otherwise, and each customer agrees not to post CoStar's photographs on its own website or on the website of a third party.

LoopNet is an Internet service provider ("ISP") whose website allows subscribers, generally real estate brokers, to post listings of commercial real estate on the Internet. It claims that its computer system contains over 100,000 customer listings of commercial real estate, including approximately 33,000 photographs, and that it was, during the district court proceedings, adding about 2200 listings each day, 250 of which include photographs. LoopNet does not post real estate listings on its own account. Rather it provides a "web hosting service that enables users who wish to display real estate over the Internet to post listings for those properties on LoopNet's web site."

When using LoopNet's services, a subscriber fills out a form and agrees to "Terms and Conditions" that include a promise not to post copies of photographs without authorization. If the subscriber includes a photograph for a listing, it must fill out another form and agree again to the "Terms and Conditions," along with an additional express warranty that the subscriber has "all necessary rights and authorizations" from the copyright owner of the photographs. The subscriber then uploads the photographs into a folder in LoopNet's system, and the photograph is transferred to the RAM of one of LoopNet's computers for review. A LoopNet employee then cursorily reviews the photograph (1) to determine whether the photograph in fact depicts commercial real estate, and (2) to identify any obvious evidence, such as a text message or copyright notice, that the photograph may have been copyrighted by another. If the photograph fails either one of these criteria, the employee deletes the photograph and notifies the subscriber. Otherwise, the employee clicks an "accept" button that prompts LoopNet's system to associate the photograph with the web page for the property listing, making the photograph available for viewing.

Beginning in early 1998, CoStar became aware that photographs for which it held copyrights were being posted on LoopNet's website by LoopNet's subscribers. When CoStar informed LoopNet of the violations, LoopNet removed the photographs. In addition, LoopNet instituted and followed a policy of marking properties to which infringing photographs had been posted so that if other photographs were posted to that property, LoopNet could inspect the photographs side-by-side to make sure that the new photographs were not the infringing photographs. By late summer 1999, CoStar had discovered 112 infringing photographs on LoopNet's website, and by September 2001, it had found over 300. At that time, LoopNet had in its system about 33,000 photographs posted by its subscribers.

CoStar commenced this action in September 1999 against Loop-Net, alleging copyright infringement, violation of the Lanham Act, and several state-law causes of action. On cross-motions for summary judgment, the district court concluded that LoopNet had not engaged in direct infringement under the Copyright Act. It left open, however, CoStar's claims that LoopNet might have contributorily infringed CoStar's copyrights and that LoopNet was not entitled to the "safe harbor" immunity provided by the Digital Millennium Copyright Act, 17 U.S.C. § 512. When the parties stipulated to the dismissal of all claims except the district court's summary judgment in favor of Loop-Net on direct infringement, the district court entered final judgment on that issue in favor of LoopNet. From entry of the judgment, CoStar noticed this appeal.

II

CoStar contends principally that the district court erred in providing LoopNet "conclusive immunity," as a "'passive' provider of Internet" services, from strict liability for its hosting of CoStar's copyrighted pictures on LoopNet's website. The district court based its decision on the reasoning of *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) ("*Netcom*"), which held that an ISP serving as a passive conduit for copyrighted material is not liable as a direct infringer. CoStar asserts that LoopNet is strictly liable for infringement of CoStar's rights protected by § 106 of the Copyright Act. According to CoStar, any immunity for the passive conduct of an ISP such as

LoopNet must come from the safe harbor immunity provided by the Digital Millennium Computer Act ("DMCA"), if at all, because the DMCA codified and supplanted the *Netcom* holding. Because Loop-Net could not meet the conditions for immunity under the DMCA as to many of the copyrighted photographs, LoopNet accordingly would be liable under CoStar's terms for direct copyright infringement for hosting web pages containing the infringing photos.

Stated otherwise, CoStar argues (1) that the *Netcom* decision was a pragmatic and temporary limitation of traditional copyright liability, which would otherwise have held ISPs strictly liable, and that in view of the enactment of the DMCA, *Netcom*'s limitation is no longer necessary; (2) that Congress considered *Netcom* in enacting the DMCA, codifying its principles and thereby supplanting and preempting *Netcom* as the only exemption from liability for direct infringement; and (3) that because LoopNet cannot satisfy the conditions of the DMCA, it remains strictly liable for direct infringement under §§ 106 and 501 of the Copyright Act. We will address CoStar's points, determining first the nature and applicability of the *Netcom* decision and second the impact of the DMCA on *Netcom*.

## A

In *Netcom*, the court held, among other things, that neither the ISP providing Internet access, nor the bulletin board service storing the posted material, was liable for direct copyright infringement under § 106 when a subscriber posted copyrighted materials on the Internet. The court observed that "[a]lthough copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to use a copy by a third party." 907 F. Supp. at 1370. In responding to the argument that the ISP's computers stored and thereby "copied" copyrighted material on its system for a period of days in rendering its service, the court stated:

> Where the infringing subscriber is clearly directly liable for the same act, it does not make sense to adopt a rule that would lead to the liability of countless parties whose role in the infringement is nothing more than setting up and operating a system that is necessary for the functioning of the

Internet. . . . The court does not find workable a theory of infringement that would hold the entire Internet liable for activities that cannot reasonable be deterred. Billions of bits of data flow through the Internet and are necessarily stored on servers throughout the network and it is thus practically impossible to screen out infringing bits from noninfringing bits. Because the court cannot see any meaningful distinction (without regard to knowledge) between what Netcom did and what every other Usenet server does, the court finds that Netcom cannot be held liable for direct infringement.

*Id.* at 1372-73.

CoStar argues, in view of the court's explanation, that the *Netcom* decision was driven by expedience and that its holding is inconsistent with the established law of copyright, as represented by *Playboy Enterprises, Inc. v. Frena*, 839 F. Supp. 1552 (M.D. Fla. 1993) (holding an ISP strictly liable for illegal copying on its computer system). It maintains that the court made a policy judgment based not on what the law was but on the fact that the Internet would have been crippled as a medium if preexisting law had been applied. It argues further that since the enactment of the DMCA in 1998, the problem identified in *Netcom* has been solved by the DMCA, and consequently there is no longer any need for the courts to continue to uphold this "special exemption" from § 106 liability for ISPs.

While the court in *Netcom* did point out the dramatic consequences of a decision that would hold ISPs strictly liable for transmitting copyrighted materials through their systems without knowledge of what was being transmitted, the court grounded its ruling principally on its interpretation of § 106 of the Copyright Act as implying a requirement of "volition or causation" by the purported infringer. This construction is one for which we have already indicated our preference over the contrary decision described in *Frena*. *See ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 622 (4th Cir. 2001). There are several reasons to commend this approach.

"[T]he Copyright Act grants the copyright holder 'exclusive' rights to use and to authorize the use of his work in five qualified ways, including reproduction of the copyrighted work in copies." *Sony*

*Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 432-33 (1984). And it provides that "[a]nyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright." 17 U.S.C. § 501. Stated at a general level, "[t]o establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). A direct infringer has thus been characterized as one who "trespasses into [the copyright owner's] exclusive domain" established in § 106, subject to the limitations of §§ 107 through 118. *Sony*, 464 U.S. at 433; *see also* 17 U.S.C. § 106 (specifying limitations).

While the Copyright Act does not require that the infringer know that he is infringing or that his conduct amount to a willful violation of the copyright owner's rights, it nonetheless requires *conduct* by a person who causes in some meaningful way an infringement. Were this not so, the Supreme Court could not have held, as it did in *Sony*, that a manufacturer of copy machines, possessing constructive knowledge that purchasers of its machine may be using them to engage in copyright infringement, is not strictly liable for infringement. 464 U.S. at 439-42. This, of course, does not mean that a manufacturer or owner of machines used for copyright violations could not have some *indirect* liability, such as contributory or vicarious liability. But such extensions of liability would require a showing of additional elements such as knowledge coupled with inducement or supervision coupled with a financial interest in the illegal copying.

The Copyright Act does not specifically provide for such extended liability, instead describing only the party who *actually engages* in infringing conduct — the one who directly violates the prohibitions. Yet under general principles of law, vicarious liability or contributory liability may be imposed:

> The absence of such express language in the copyright statute does not preclude the imposition of liability for copyright infringements on certain parties who have not themselves engaged in the infringing activity. For vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in

which it is just to hold one individual accountable for the actions of another.

*Sony*, 464 U.S. at 435. Under a theory of contributory infringement, "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another" is liable for the infringement, too. *Gershwin Publishing Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) (footnote omitted). Under a theory of vicarious liability, a defendant who "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities" is similarly liable. *Id.*

But to establish *direct* liability under §§ 501 and 106 of the Act, something more must be shown than mere ownership of a machine used by others to make illegal copies. There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner. The *Netcom* court described this nexus as requiring some aspect of volition or causation. 907 F. Supp. at 1370. Indeed, counsel for both parties agreed at oral argument that a copy machine owner who makes the machine available to the public to use for copying is not, without more, strictly liable under § 106 for illegal copying by a customer. The ISP in this case is an analogue to the owner of a traditional copying machine whose customers pay a fixed amount per copy and operate the machine themselves to make copies. When a customer duplicates an infringing work, the owner of the copy machine is not considered a direct infringer. Similarly, an ISP who owns an electronic facility that responds automatically to users' input is not a direct infringer. If the Copyright Act does not hold the owner of the copying machine liable as a direct infringer when its customer copies infringing material without knowledge of the owner, the ISP should not be found liable as a direct infringer when its facility is used by a subscriber to violate a copyright without intervening conduct of the ISP.

Moreover, in the context of the conduct typically engaged in by an ISP, construing the Copyright Act to require some aspect of volition and meaningful causation — as distinct from passive ownership and management of an electronic Internet facility — receives additional support from the Act's concept of "copying." A violation of § 106

requires copying or the making of copies. *See* 17 U.S.C. § 106(1), (3); *id.* § 102(a); *Feist Publishing*, 449 U.S. at 361. And the term "copies" refers to "material objects . . . in which a work *is fixed*." 17 U.S.C. § 101 ("Definitions") (emphasis added). A work is "fixed" in a medium when it is embodied in a copy "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period *of more than transitory duration*." *Id.* (emphasis added). When an electronic infrastructure is designed and managed as a *conduit* of information and data that connects users over the Internet, the owner and manager of the conduit hardly "copies" the information and data in the sense that it fixes a copy in its system *of more than transitory duration*. Even if the information and data are "downloaded" onto the owner's RAM or other component as part of the transmission function, that downloading is a temporary, automatic response to the user's request, and the entire system functions solely to transmit the user's data to the Internet. Under such an arrangement, the ISP provides a system that automatically transmits users' material but is itself totally indifferent to the material's content. In this way, it functions as does a traditional telephone company when it transmits the contents of its users' conversations. While temporary electronic copies may be made in this transmission process, they would appear not to be "fixed" in the sense that they are "of more than transitory duration," and the ISP therefore would not be a "copier" to make it directly liable under the Copyright Act. With additional facts, of course, an ISP could become *indirectly* liable.

In concluding that an ISP has not itself fixed a copy in its system of more than transitory duration when it provides an Internet hosting service to its subscribers, we do not hold that a computer owner who downloads copyrighted software onto a computer cannot infringe the software's copyright. *See, e.g.*, *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518-19 (9th Cir. 1993). When the computer owner downloads copyrighted software, it possesses the software, which then functions in the service of the computer or its owner, and the copying is no longer of a transitory nature. *See, e.g.*, *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 260 (5th Cir. 1988). "Transitory duration" is thus both a qualitative and quantitative characterization. It is quantitative insofar as it describes the period during which the function occurs, and it is qualitative in the sense that it describes the status of transition. Thus, when the copyrighted software is down-

loaded onto the computer, because it may be used to serve the computer or the computer owner, it no longer remains transitory. This, however, is unlike an ISP, which provides a system that automatically receives a subscriber's infringing material and transmits it to the Internet at the instigation of the subscriber.

Accordingly, we conclude that *Netcom* made a particularly rational interpretation of § 106 when it concluded that a person had to engage in volitional conduct — specifically, the act constituting infringement — to become a direct infringer. As the court in *Netcom* concluded, such a construction of the Act is especially important when it is applied to cyberspace. There are thousands of owners, contractors, servers, and users involved in the Internet whose role involves the storage and transmission of data in the establishment and maintenance of an Internet facility. Yet their conduct is not truly "copying" as understood by the Act; rather, they are conduits from or to would-be copiers and have no interest in the copy itself. *See Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) ("A web host, like a delivery service or phone company, is an intermediary and normally is indifferent to the content of what it transmits"). To conclude that these persons are copyright infringers simply because they are involved in the ownership, operation, or maintenance of a transmission facility that automatically records material — copyrighted or not — would miss the thrust of the protections afforded by the Copyright Act. In rejecting even contributory infringement in some of such circumstances, the Supreme Court stated:

> The staple article of commerce doctrine must strike a balance between a copyright holder's legitimate demand for effective — not merely symbolic — protection of the statutory monopoly, and the rights of others freely to engage in substantially unrelated areas of commerce.

*Sony*, 464 U.S. at 442. We thus find it an overstatement by CoStar to argue that *Netcom* represented the adoption of a new "special liability-limiting rule for Internet servers."

### B

CoStar rests its position not only on the marginalization of the *Netcom* holding, but also on the assertion that the DMCA rendered *Net-*

*com* no longer necessary — indeed, even codified and preempted *Netcom* — by imposing an exclusive safe harbor for ISPs that fulfill the conditions of the DMCA. CoStar argues that because the DMCA supplanted *Netcom*, LoopNet must rely for its defense exclusively on the immunity conferred by the DMCA. This argument, however, is belied by the plain language of the DMCA itself.

The DMCA was enacted as § 512 of the Copyright Act. The relevant subsection of § 512 provides limitations on liability "for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service for the [Internet] service provider" if the ISP lacks scienter about a copyright violation by a user, does not profit directly from the violation, and responds expeditiously to a proper notice of the violation. *See* 17 U.S.C. § 512(c)(1). In order to enjoy the safe harbor provided by § 512(c), the ISP must also fulfill other conditions imposed by the DMCA. *See id.* § 512(c), (i). Even though the DMCA was designed to provide ISPs with a safe harbor from copyright liability, nothing in the language of § 512 indicates that the limitation on liability described therein is exclusive. Indeed, another section of the DMCA provides explicitly that the DMCA is *not* exclusive:

> *Other defenses not affected.* — The failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense.

*Id.* § 512(*l*). Thus the statute specifically provides that despite a failure to meet the safe-harbor conditions in § 512(c) and (i), an ISP is still entitled to all other arguments under the law — whether by way of an affirmative defense or through an argument that conduct simply does not constitute a prima facie case of infringement under the Copyright Act.

Given that the statute declares its intent not to "bear adversely upon" any of the ISP's defenses under law, including the defense that the plaintiff has not made out a prima facie case for infringement, it

is difficult to argue, as CoStar does, that the statute in fact precludes ISPs from relying on an entire strain of case law holding that direct infringement must involve conduct having a volitional or causal aspect. Giving such a construction to the DMCA would in fact "bear adversely upon the consideration" of this defense, in direct contravention of § 512(*l*). We conclude that in enacting the DMCA, Congress did not preempt the decision in *Netcom* nor foreclose the continuing development of liability through court decisions interpreting §§ 106 and 501 of the Copyright Act.

CoStar advances the additional argument that because "Congress 'codified' *Netcom* in the DMCA . . . it can only be *to the DMCA* that we look for enforcement of those principles." The brief of several *amici* echoes this point with the assertion that "if Congress intended *Netcom* to survive the DMCA, there would have been no need to enact the statute in the first place." CoStar and the *amici*, however, have this point of statutory construction exactly backward. When Congress codifies a common-law principle, the common law remains not only good law, but a valuable touchstone for interpreting the statute, unless Congress explicitly states that it *intends* to supplant the common law. "The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *Midatlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986) (citing *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 266-67 (1979)); *Harper & Rowe, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 549 (1985) (observing that § 107 of the Copyright Act, articulating the elements of the fair use defense, "'restate[s] [not changes] pre-existing judicial doctrine") (quoting H.R. Rep. No. 94-1476, at 66 (1976)). Thus, without explicit statutory instructions, the cases drawn upon by Congress in writing legislation are *not* supplanted by the legislation, and courts may — indeed should — continue to look to these cases for guidance.

CoStar's argument that the DMCA supplanted and preempted *Netcom* is further undermined by the DMCA's legislative history. Congress actually expressed its intent that the courts would continue to determine how to apply the Copyright Act to the Internet and that the DMCA would merely create a floor of protection for ISPs. After citing the conflicting decisions in *Netcom* and *Frena*, the Senate Com-

mittee on the Judiciary explained that "rather than embarking upon a wholesale clarification of these doctrines, the Committee decided to leave current law in its evolving state and, instead, to create a series of 'safe harbors,' for certain common activities of service providers." S. Rep. No. 105-190, at 19 (1998). The Ninth Circuit has found this language persuasive, citing it in finding that "[t]he DMCA did not simply rewrite copyright law for the on-line world." *Ellison v. Robertson*, 357 F.3d 1072, 1077 (9th Cir. 2004). Furthermore, the final conference report supports this passage, stating:

> As provided in subsection (l), Section 512 is not intended to imply that a service provider is or is not liable as an infringer either for conduct that qualifies for a limitation of liability or for conduct that fails to so qualify. Rather, the limitations of liability apply if the provider is found to be liable under existing principles of law.

H.R. Conf. Rep. No. 105-796, at 73 (1998), *reprinted in* 1998 U.S.C.C.A.N. 639, 649. Thus the DMCA was intended not to change the "evolving" doctrines on ISP liability for copyright infringement, which included *Netcom* and *Frena*, but to offer a certain safe harbor for ISPs. Courts were left free to continue to construe the Copyright Act in deciding the scope and nature of prima facie liability. The legislative "compromise" repeatedly invoked by CoStar and its *amici* was that Congress would not end the debate by importing and fixing copyright infringement liability in the form articulated by *Netcom*, but rather would provide a limited safe harbor immediately necessary to ISPs, and allow the courts to continue defining what constitutes a prima facie case of copyright infringement against an ISP.

CoStar challenges our conclusion by relying also on a passage from *ALS Scan*, which is concededly ambiguous when taken out of context, where we wrote:

> Although we find the *Netcom* court reasoning more persuasive, the ultimate conclusion on this point is controlled by Congress' codification of the *Netcom* principles in Title II of the DMCA. As the House Report for that Act states,
>
> > The bill distinguishes between direct infringement and secondary liability, treating each separately.

This structure is consistent with evolving case law, and appropriate in light of the different legal bases for and policies behind the different forms of liability.

As to direct infringement, liability is ruled out for passive, automatic acts engaged in through a technological process initiated by another. Thus the bill essentially codifies the result in the leading and most thoughtful judicial decision to date: *Religious Technology Center v. Netcom On-Line Communications Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995). In doing so, it overrules these aspects of *Playboy Enterprises, Inc. v. Frena*, 839 F. Supp. 1552 (M.D. Fla. 1993), insofar as that case suggests that such acts by service providers could constitute direct infringement, and provides certainty that *Netcom* and its progeny, so far only a few district court cases, will be the law of the land.

H.R. Rep. No. 105-551(I), at 11 (1998). Accordingly, we address only ALS Scan's claims brought under the DMCA itself.

*ALS Scan*, 239 F.3d at 622. This portion of legislative history was referring to an earlier version of the legislation, in which the entire holding of *Netcom* was imported.* The distinction between this ear-

---

*The earlier version of the bill, to which this language referred, read:

(a) Limitation. . . . [A] provider shall not be liable for —

(1) direct infringement, based solely on the intermediate storage and transmission of material through a system or network controlled or operated by or for that provider, if —

(A) the transmission was initiated by another person;

(B) the storage and transmission is carried out through an automatic technological process, without any selection of that material by the provider; and

lier bill and the legislation as ultimately passed was not relevant to the holding in *ALS Scan*, where we denied summary judgment to both parties and remanded for the district court to determine facts that would be relevant to whether the defendant had committed contributory or vicarious infringement, such as whether the defendant system's "'sole purpose' [was] infringement of ALS Scan's copyrights," and whether "'virtually all' the images posted in the newsgroups [were] infringing." *Id.* at 626. Indeed, we noted that "[i]t would appear that ALS Scan's allegations amount more to a claim of contributory infringement . . . than to a claim of direct infringement." *Id.* at 621 n.1.

With respect to the issue of what creates liability for direct infringement, the distinction between the two bills is more important. The earlier version of the bill was meant to incorporate all of *Netcom*'s protections, whereas the final law reflected the above-mentioned compromise between the earlier version and the concerns

> (C) no copy of the material thereby made by the provider is maintained on the provider's system or network in a manner ordinarily accessible to anyone other than the recipients anticipated by the person who initiated the transmission, and no such copy is maintained on the system or network in a manner ordinarily accessible to such recipients for a longer period than is reasonably necessary for the transmission. . . .

H.R. Rep. No. 105-551, pt. 1, at 7-8 (1998). These provisions most closely resemble those codified at 17 U.S.C. § 512(a), but the final legislation differs in several ways that are important to this case. First, the law as enacted draws no distinction between direct and indirect liability for infringement. Second, the earlier version does not appear to address how to treat material for which the ISP acts as a host server, allowing users to post the information in anticipation that other users will request the information to be transmitted to them, as LoopNet and many other ISPs do. In the final legislation, "[i]nformation residing on systems or networks at [the] direction of users" is specifically addressed. 17 U.S.C. § 512(c). Finally, unlike the earlier version, which would have exempted ISPs unconditionally for direct liability for automatic processes, the enacted law requires ISPs to fulfill certain "[c]onditions for eligibility" for the safe harbors. *Id.* § 512(i).

of copyright-holders. Congress would enact certain safe-harbor provisions absolutely necessary to the immediate survival of ISPs, while courts would continue to consider the question of whether passive ISPs could ever be directly liable for violations of copyright committed using their systems.

It is clear that Congress intended the DMCA's safe harbor for ISPs to be a floor, not a ceiling, of protection. Congress said nothing about whether passive ISPs should ever be held strictly liable as direct infringers or whether plaintiffs suing ISPs should instead proceed under contributory theories. The DMCA has merely added a second step to assessing infringement liability for Internet service providers, after it is determined whether they are infringers in the first place under the preexisting Copyright Act. Thus, the DMCA is irrelevant to determining what constitutes a prima facie case of copyright infringement.

At bottom, we hold that ISPs, when passively storing material at the direction of users in order to make that material available to other users upon their request, do not "copy" the material in direct violation of § 106 of the Copyright Act. Agreeing with the analysis in *Netcom*, we hold that the automatic copying, storage, and transmission of copyrighted materials, when instigated by others, does not render an ISP strictly liable for copyright infringement under §§ 501 and 106 of the Copyright Act. An ISP, however, can become liable indirectly upon a showing of additional involvement sufficient to establish a contributory or vicarious violation of the Act. In that case, the ISP could still look to the DMCA for a safe harbor if it fulfilled the conditions therein.

## III

CoStar contends that even under *Netcom*'s construction of copyright infringement liability for ISPs, LoopNet's conduct in this case is more than passive, in that LoopNet screens photographs posted by its subscribers. In CoStar's opinion, this screening process renders LoopNet liable for direct copyright infringement.

LoopNet, like other ISPs, affords its subscribers an Internet-based facility on which to post materials, but the materials posted are of a

type and kind selected by the subscriber and at a time initiated by the subscriber. Similarly, users who wish to access a subscriber's information may do so without intervention from LoopNet. A subscriber seeking to post a listing on LoopNet's website containing only *text* fills out a form and agrees to LoopNet's "Terms and Conditions," which include the obligation to respect others' copyrights. Once the subscriber has filled out the form and agreed to the "Terms and Conditions," an identification number is automatically assigned to the listing, and a web page containing the listing and the identification number is automatically created. The web page is then hosted on LoopNet's website to be viewed by users who request the listing. CoStar does not contend that LoopNet's activity in signing up subscribers with *only* textual property listings is anything other than passive.

To argue that LoopNet loses its status as a passive ISP and therefore becomes liable for direct copyright infringement, CoStar focuses on LoopNet's gatekeeping practice with respect to photographs. To add a photograph to a listing, the subscriber must fill out another form and again agree to the "Terms and Conditions." After expressly warranting that he has "all necessary rights and authorizations from the . . . copyright owner of the photographs," the subscriber uploads the photograph into a folder in LoopNet's system. The photograph is then transferred to the RAM of one of LoopNet's computers for review. A LoopNet employee reviews the photo for two purposes: (1) to block photographs that do not depict commercial real estate, and (2) to block photographs with obvious signs that they are copyrighted by a third party. If the photograph carries a copyright notice or represents subject matter other than commercial real estate, the employee deletes the photograph; otherwise, she clicks a button marked "accept," and LoopNet's system automatically associates the photograph with the subscriber's web page for the property listing, making it available for use. Unless a question arises, this entire process takes "a few seconds."

Although LoopNet engages in volitional conduct to block photographs measured by two grossly defined criteria, this conduct, which takes only seconds, does not amount to "copying," nor does it add volition to LoopNet's involvement in storing the copy. The employee's look is so cursory as to be insignificant, and if it has any signifi-

cance, it tends only to lessen the possibility that LoopNet's automatic electronic responses will inadvertently enable others to trespass on a copyright owner's rights. In performing this gatekeeping function, LoopNet does not attempt to search out or select photographs for duplication; it merely *prevents* users from duplicating certain photographs. To invoke again the analogy of the shop with the copy machine, LoopNet can be compared to an owner of a copy machine who has stationed a guard by the door to turn away customers who are attempting to duplicate clearly copyrighted works. LoopNet has not by this screening process become engaged as a "copier" of copyrighted works who can be held liable under §§ 501 and 106 of the Copyright Act.

To the extent that LoopNet's intervention in screening photographs goes further than the simple gatekeeping function described above, it is because of CoStar's complaints about copyright violations. Whenever CoStar has complained to LoopNet about a particular photograph, LoopNet has removed the photograph, and the property listing with which the photograph was associated has been marked. The next time the user tries to post a photograph to accompany that listing, LoopNet conducts a manual side-by-side review to make sure that the user is not reposting the infringing photograph. CoStar and other copyright holders benefit significantly from this type of response. If they find such conduct by an ISP too active, they can avoid it by adding a copyright notice to their photographs, which CoStar does not do. CoStar can hardly request LoopNet to prevent its users from infringing upon particular unmarked photographs and then subsequently seek to hold LoopNet liable as a direct infringer when LoopNet complies with CoStar's request.

In short, we do not conclude that LoopNet's perfunctory gatekeeping process, which furthers the goals of the Copyright Act, can be taken to create liability for LoopNet as a direct infringer when its conduct otherwise does not amount to direct infringement.

For the reasons given, we affirm the judgment of the district court.

*AFFIRMED*

GREGORY, Circuit Judge, dissenting:

While I largely agree with the majority's careful explication of the direct infringement doctrine within the cybersphere post-DMCA, I cannot join the majority's application of that law. First, I disagree with the majority's characterizations of LoopNet as "an analogue to the owner of a traditional copying machine whose customers pay a fixed amount per copy and operate the machine themselves to make copies," *ante* at 9, and its comparison of the company to "an owner of a copy machine who has stationed a guard by the door to turn away customers who are attempting to duplicate clearly copyrighted works," *id.* at 19. Specifically, these ill-fitting characterizations lead the majority to the erroneous conclusion that LoopNet is not liable for direct infringement despite its volitional screening process. Because I would hold that LoopNet engages in non-passive, volitional conduct with respect to the photographs on its website such that the *Netcom* defense does not apply, I respectfully dissent.

I

In examining whether LoopNet is a passive provider not subject to direct infringement liability, the majority conducts a comparison of LoopNet's posting processes as to text and images. The majority properly recognizes, and CoStar does not dispute, that when a subscriber posts text to LoopNet's website the process is completely passive. Indeed, whatever text the subscriber enters into LoopNet's form is automatically uploaded to, and immediately accessible on, Loop-Net's website. By contrast, when a subscriber wishes to post a photograph on the site, such posting is not automatic or immediate. Instead, the photograph is transferred to LoopNet's computers where one of the company's employees can review the photo to ensure (1) it is an image of commercial real estate, and (2) it is not an obviously copyrighted image.

At this stage of the process the LoopNet employee has a choice, he or she can reject the photograph because it does not comply with the above-noted criteria, or he or she can "accept" the photograph, at which time it becomes accessible on the subscriber's web page to which the text was previously and automatically uploaded. The majority thus finds itself in a bind, namely how is this decision by the

LoopNet employee whether or not to "accept" an image akin to the automated posting of text such that it, too, does not constitute direct infringement. The majority attempts to resolve this paradox by first admitting, "LoopNet engages in *volitional conduct to block photographs*," *ante* at 18 (emphasis added), however, it reasons, "this conduct, which takes only seconds, does not amount to 'copying,' nor does it *add volition* to LoopNet's involvement in storing the copy. The employee's look is so cursory as to be insignificant . . . . In performing this gatekeeping function, LoopNet does not attempt to search out or select photographs for duplication; it merely *prevents* users from duplicating certain photographs." *Id.* (first emphasis added). In so determining that LoopNet's "gatekeeping function" does not expose it to direct infringement liability, I submit that the majority expands the non-volitional defense well beyond *Netcom* and subsequent holdings, and gives direct infringers in the commercial cybersphere far greater protections than they would be accorded in print and other more traditional media.

## II

In *Netcom*, the court recognized that traditional strict liability copyright principles were ill-suited to cyberspace. *See* 907 F. Supp. at 1369-73. Bulletin board operators and other ISPs provided a forum for content, a truly open communicative space over which they exercised no control; in a sense, they were publishers who did not — and could not, because of their automated processes — review their own "publications." In recognizing the realities of this new information domain, the *Netcom* court rejected copyright owners' claims against an ISP, reasoning that the ISP did not take any affirmative action that resulted in copying plaintiffs' works other than maintaining a system through which software automatically forwarded subscribers' messages onto Usenet. *See Netcom*, 907 F. Supp. at 1368. The court observed that the ISP did not "initiate[ ] the copying," and its system operated without any human interaction, thus "the mere fact that [the ISP's] system incidentally makes temporary copies of plaintiffs' works does not mean [the ISP] has caused the copying." *Id.* at 1368-69. The *Netcom* court concluded: "Although copyright is a strict liability statute, there should still be some element of volition or causation which is lacking . . . ." *Id.* at 1370. Accordingly, the *Netcom* rule was fashioned to protect computer systems that *automatically* transfer

data with no realistic manner by which the operator can monitor content. *See id.* at 1369-70 (stating plaintiff's theory "would result in liability for every single Usenet server in the worldwide link of computers transmitting [the message] to every other computer. These parties, who are liable under plaintiffs' theory, do *no more than* operate or implement a system that is essential if Usenet messages are to be widely distributed." (emphasis added)); *see also Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1167 (C.D. Cal. 2002) ("Computer technology, and in particular the Internet, has created a challenge to copyright's strict liability scheme. Because of the architecture of the web and the workings of computer technology, almost any business that utilizes computer hardware to create access to the Internet or to store content may find its hardware creating or displaying infringing material *as a result of decisions by third-parties (the system's users) without the business doing any truly volitional actions.*" (emphasis added)).

Since *Netcom*, courts have recognized that the non-volitional defense to direct infringement claims extends only to "passive" service providers, through which data flow is "automatic." In *ALS Scan*, we stated of *Netcom*, "when an Internet provider serves, *without human intervention*, as a *passive conduit* for copyrighted material, it is not liable as a direct infringer." 239 F.3d at 622 (Niemeyer, J.) (emphasis added); *see also Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 552 (N.D. Tex. 1997); *Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 513 (N.D. Ohio 1997). In this case, however, the majority profoundly deviates from the passivity approach.

The difference between LoopNet's conduct in this case and the protection originally afforded by *Netcom* is illustrated by examining the *Netcom* court's aforementioned statement that "Netcom did not take any affirmative action that directly resulted in copying plaintiffs' works *other than* by installing and maintaining a system whereby software *automatically* forwards messages received from subscribers onto the Usenet, and temporarily stores copies on its system." 907 F. Supp. at 1368 (emphasis added). Here, however, LoopNet's conduct with regard to the photos is anything but automatic. In contrast to the real estate property descriptions which are *automatically* uploaded to

the website without any service provider input, the photos *cannot* appear on LoopNet's site *without* operator approval.

The majority tries to diminish the importance of this fact by arguing that the review is very brief and the reviewer presses a single button. At the heart of the review, however, is an inherently "volitional" action without which the subscriber's photos would not be accessible. For every photograph submitted, a LoopNet employee must determine: (1) is this real estate and (2) does the photo comply — on its face, at least — with our terms and conditions. These inquiries are the antitheses of passive, automatic actions. *See Russ Hardenburgh, Inc.*, 982 F. Supp. at 513 (denying *Netcom* immunity to BBS operator which (1) encouraged subscribers to upload files and (2) employed "*a screening procedure in which [the operator's] employees viewed all files in the upload file and moved them into the generally available files for subscribers*" (emphasis added)); *id.* (stating those facts "transform Defendants from passive providers of a space in which infringing activities happened to occur to active participants in the process of copyright infringement"); *cf. Webbworld, Inc.*, 991 F. Supp. 543, 552 (N.D. Tex. 1997) (refusing to apply *Netcom* immunity to defendant that "did not function as a mere provider of access," but provided content and functioned as a "commercial destination within the Internet"). As the district court in *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d at 1168, recently remarked "[t]he principle distilled from these [cyber direct infringement] cases is that defendants must *actively* engage in one of the activities recognized in the Copyright Act." Similarly, we emphasized in *ALS Scan*, 239 F.3d at 622, it was the lack of "human intervention" which rendered Netcom a passive service provider. Here, however, humans employed by LoopNet limited the content of postings and screened and sometimes edited photos to keep quality consistent, thus taking the case far outside the previously understood scope of coverage for *Netcom*'s volitional defense.

The majority downplays LoopNet's volition, and the break from previous application of the volitional defense, by focusing on the fact that it is *the subscriber*, not LoopNet, who begins the volitional process, *i.e.*, the subscriber is the initial direct infringer.[1] This distinction,

---

[1] The majority also seemingly attempts to garner support for its argument by implying that LoopNet is a "conduit[ ] from or to would-be cop-

however, is illusory, as I believe is demonstrated by analyzing Loop-Net's actions through the hypothetical of a more traditional copyright context.

Consider the following example: *LoopNet Magazine* is a for-profit publication freely distributed in curbside boxes that displays commercial real estate listings. *LoopNet Magazine* solicits listings from its readership, but neither the reader who submits the listing, nor the reader accessing the listing pays for the service. Instead, *LoopNet Magazine* subsists on advertising revenue and other products it sells through the publication. Readers may electronically submit textual listings, or those with text and graphics. When *LoopNet Magazine* receives a text listing, its computers automatically transfer the content into the template for the next issue. However, when a reader submits a photograph, he or she must submit a digital image and sign a terms and conditions release stating that he or she has not infringed the copyright of the image submitted. *LoopNet Magazine* employees engage in a quick review of the images to determine that they are, in fact, pictures of real estate and that no obvious copyright has been violated.

Reader X sends *LoopNet Magazine* text describing commercial office space for rent in New York City's renowned Flatiron Building; the text describing the property is, of course, automatically inserted into the *LoopNet Magazine* template and is ready for publication. Reader X has also submitted a photograph of the Flatiron Building, and signs the terms and conditions form. Reader X knows, however, that she has not complied with the terms and conditions because the photo is not hers, rather it is Edward Steichen's 1905 photograph, *The Flatiron*. *LoopNet Magazine*'s Intern Y receives the photo of the Flat-

---

iers [who] ha[s] no interest in the copy itself." *Ante* at 11 (citing *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003). However, unlike the web-host in *Doe v. GTE Corp.*, which was "an intermediary . . . indifferent to the content of what it transmits," 347 F.3d at 659, LoopNet has a deeply vested interest in its content. Its entire screening process takes place to further its commercial aims, ensuring that the photos which appear comply with the website's purpose, namely advertising commercial real estate.

iron Building, notes Reader X has signed the terms and conditions, and evaluates the photo for a few seconds. Intern Y finds the image to be a beautiful depiction of the building, precisely the type of material *LoopNet Magazine* seeks to display, and does not recognize it as the copyrighted Steichen image. However, Intern Y finds that the image was "uploaded in a format that's not correct," so he takes steps to remedy the image "so that it can appear [in the publication] without any technical problems." J.A. 175 (deposition testimony of Fed. R. Civ. P. Rule 30(b)(6) designee Dennis DeAndre, LoopNet's CEO, regarding formatting in which the company sometimes engages after the screening process). Once properly formatted, the image appears in the next issue of *LoopNet Magazine*, and Steichen's estate sues both Reader X and *LoopNet Magazine* for direct infringement. Is *LoopNet Magazine* relieved of direct infringement liability because its screening process was most brief, a simple "yes" or "no" inquiry conducted by an intern, followed by a formatting correction? Of course not,[2] but no different is the situation here.

That another person initiated the process which led to LoopNet's infringement is of no consequence. LoopNet remains the pivotal volitional *actor*, "but for" whose action, the images would never appear on the website. Indeed, "volition" is defined as "the act of willing or choosing[;] the act of deciding (as on a course of action or an end to be striven for)[;] the exercise of the will . . . [or] the termination of an act or exercise of choosing or willing[;] a state of decision or choice." *Webster's Third New International Dictionary of the English Language, unabridged* 2562 (1981). Under any analytical framework, LoopNet has engaged in active, volitional conduct; its employees make a conscious choice as to whether a given image will appear in its electronic publication, or whether the image will be deleted from the company's system.[3] Nothing in the brief nature of LoopNet's

---

[2]*See generally Keeler Brass Co. v. Cont'l Brass Co.*, 862 F.2d 1063, 1065 (4th Cir. 1988) (discussing elements of a direct infringement claim); *see also Ortiz-Gonzalez v. Fonovisa*, 277 F.3d 59, 62 (1st Cir. 2002) (stating "if [defendant] distributed copies of [plaintiff's] copyrighted work, the act of distribution is a direct infringement itself, not an act of contributory or vicarious infringement").

[3]The majority also attempts to argue that LoopNet has not made a "copy" of the image. In doing so, it largely accepts LoopNet's argument

review makes the company akin to a copy machine owner or a security guard by the owner's door. LoopNet *is* the publisher of *LoopNet Magazine* in cyberform; a volitional copier of images to whom direct infringement liability applies. Because I believe that the *Netcom* volitional defense should focus on passivity and the automated nature of the act — *not* the fact that a user's initial volition somehow exterminates liability for later volitional acts — I would reverse the district court. Accordingly, I respectfully dissent.

---

that rather than copying the images, the company simply "moves" an image already stored by modifying the computer's directory, thus transforming the image from one not accessible by users who "hit" the website to one that users can view. The majority states "downloading is a temporary, automatic response to the user's request, and the entire system functions solely to transmit the user's data to the Internet." *Ante* at 10; *see also id.* at 11. The majority's analysis, however, rests on a technicality that does not comport with reality. While LoopNet may not "copy" the images in a traditional sense, the fact is that without LoopNet's volitional action, the subscriber's image would *never* be uploaded to the subscriber's webspace on the LoopNet site no matter how much that subscriber might desire to have the image so appear. *See Advanced Computer Sys., Inc. v. Peak Computer Sys., inc.*, 991 F.2d 511, 519 (9th Cir. 1993) (holding loading of data to RAM "creates a 'copy' under the Copyright Act"). Thus, LoopNet is in every sense a publisher controlling content. In short, it is LoopNet, not the subscriber, who has the final say in selecting and determining photographic content on the website.