PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ALS SCAN, INCORPORATED,
        *Plaintiff-Appellant,*

v.

REMARQ COMMUNITIES,
INCORPORATED,
        *Defendant-Appellee.*

No. 00-1351

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Chief District Judge.
(CA-99-2594-JFM)

Argued: November 1, 2000

Decided: February 6, 2001

Before WIDENER, WILKINS, and NIEMEYER, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by published opinion. Judge Niemeyer wrote the opinion, in which Judge Widener and Judge Wilkins joined.

---

## COUNSEL

**ARGUED:** Harry Brett Siegel, LAW OFFICE OF JOEL MARC ABRAMSON, Columbia, Maryland, for Appellant. Robert R. Vieth, COOLEY GODWARD, L.L.P., Reston, Virginia, for Appellee. **ON BRIEF:** Robert T. Cahill, COOLEY GODWARD, L.L.P., Reston, Virginia, for Appellee.

**OPINION**

NIEMEYER, Circuit Judge:

We are presented with an issue of first impression — whether an Internet service provider enjoys a safe harbor from copyright infringement liability as provided by Title II of the Digital Millennium Copyright Act ("DMCA") when it is put on notice of infringement activity on its system by an imperfect notice. Because we conclude that the service provider was provided with a notice of infringing activity that *substantially* complied with the Act, it may not rely on a claim of defective notice to maintain the immunity defense provided by the safe harbor. Accordingly, we reverse the ruling of the district court that found the notice fatally defective, and affirm its remaining rulings.

I

ALS Scan, Inc., a Maryland corporation, is engaged in the business of creating and marketing "adult" photographs. It displays these pictures on the Internet to paying subscribers and also sells them through the media of CD ROMs and videotapes. ALS Scan is holder of the copyrights for all of these photographs.

RemarQ Communities, Inc., a Delaware corporation, is an online Internet service provider that provides access to its subscribing members. It has approximately 24,000 subscribers to its newsgroup base and provides access to over 30,000 newsgroups which cover thousands of subjects. These newsgroups, organized by topic, enable subscribers to participate in discussions on virtually any topic, such as fine arts, politics, religion, social issues, sports, and entertainment. For example, RemarQ provides access to a newsgroup entitled "Baltimore Orioles," in which users share observations or materials about the Orioles. It claims that users post over one million articles a day in these newsgroups, which RemarQ removes after about 8-10 days to accommodate its limited server capacity. In providing access to newsgroups, RemarQ does not monitor, regulate, or censor the content of articles posted in the newsgroup by subscribing members. It does, however, have the ability to filter information contained in the

newsgroups and to screen its members from logging onto certain newsgroups, such as those containing pornographic material.

Two of the newsgroups to which RemarQ provides its subscribers access contain ALS Scan's name in the titles. These newsgroups — "alt.als" and "alt.binaries.pictures.erotica.als" — contain hundreds of postings that infringe ALS Scan's copyrights. These postings are placed in these newsgroups by RemarQ's subscribers.

Upon discovering that RemarQ databases contained material that infringed ALS Scan's copyrights, ALS Scan sent a letter, dated August 2, 1999, to RemarQ, stating:

> Both of these newsgroups ["alt.als" and "alt.binaries.pictures.erotica.als"] were created for the sole purpose of violating our Federally filed Copyrights and Tradename. These newsgroups contain virtually all Federally Copyrighted images. . . . Your servers provide access to these illegally posted images and enable the illegal transmission of these images across state lines.
>
> This is a cease and desist letter. You are hereby ordered to cease carrying these newsgroups within twenty-four (24) hours upon receipt of this correspondence . . . .
>
> America Online, Erol's, Mindspring, and others have all complied with our cease and desist order and no longer carry these newsgroups.
>
> \*     \*     \*
>
> Our ALS Scan models can be identified at *http://www.alsscan.com/modlinf2.html*[.] Our copyright information can be reviewed at *http://www.alsscan.com/copyrite.html*[.]

RemarQ responded by refusing to comply with ALS Scan's demand but advising ALS Scan that RemarQ would eliminate individual infringing items from these newsgroups if ALS Scan identified them

"with sufficient specificity." ALS Scan answered that RemarQ had included over 10,000 copyrighted images belonging to ALS Scan in its newsgroups over the period of several months and that

> [t]hese newsgroups have apparently been created by individuals for the express sole purpose of illegally posting, transferring and disseminating photographs that have been copyrighted by my client through both its websites and its CD-ROMs. The newsgroups, on their face from reviewing messages posted thereon, serve no other purpose.

When correspondence between the parties progressed no further to resolution of the dispute, ALS Scan commenced this action, alleging violations of the Copyright Act and Title II of the DMCA, as well as unfair competition. In its complaint, ALS Scan alleged that RemarQ possessed actual knowledge that the newsgroups contained infringing material but had "steadfastly refused to remove or block access to the material." ALS Scan also alleged that RemarQ was put on notice by ALS Scan of the infringing material contained in its database. In addition to injunctive relief, ALS Scan demanded actual and statutory damages, as well as attorneys fees. It attached to its complaint affidavits establishing the essential elements of its claims.

In response, RemarQ filed a motion to dismiss the complaint or, in the alternative, for summary judgment, and also attached affidavits, stating that RemarQ was prepared to remove articles posted in its newsgroups if the allegedly infringing articles were specifically identified. It contended that because it is a provider of access to newsgroups, ALS Scan's failure to comply with the DMCA notice requirements provided it with a defense to ALS Scan's copyright infringement claim.

The district court ruled on RemarQ's motion, stating, "[RemarQ's] motion to dismiss or for summary judgment is treated as one to dismiss and, as such, is granted." In making this ruling, the district court held: (1) that RemarQ could not be held liable for *direct* copyright infringement merely because it provided access to a newsgroup containing infringing material; and (2) that RemarQ could not be held liable for *contributory* infringement because ALS Scan failed to comply

with the notice requirements set forth in the DMCA, 17 U.S.C. § 512(c)(3)(A). This appeal followed.

## II

ALS Scan contends first that the district court erred in dismissing its *direct* copyright infringement claim. It contends that it stated a cause of action for copyright infringement when it alleged (1) the "ownership of valid copyrights," and (2) RemarQ's violation of its copyrights "by allowing its members access to newsgroups containing infringing material."[1] *See generally Keeler Brass Co. v. Continental Brass Co.*, 862 F.2d 1063, 1065 (4th Cir. 1988) (describing the requirements of a direct infringement claim). In rejecting ALS Scan's direct infringement claim, the district court relied on the decision in *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361, 1368-73 (N.D. Cal. 1995), which concluded that when an Internet provider serves, without human intervention, as a passive conduit for copyrighted material, it is not liable as a direct infringer. The *Netcom* court reasoned that "it does not make sense to adopt a rule that could lead to liability of countless parties whose role in the infringement is nothing more than setting up and operating a system that is necessary for the functioning of the Internet." *Id.* at 1372. That court observed that it would not be workable to hold "the entire Internet liable for activities that cannot reasonably be deterred." *Id.*; *see also Marobie-FL, Inc. v. National Ass'n of Fire Equip. Distribs.*, 983 F. Supp. 1167, 1176-79 (N.D. Ill. 1997) (agreeing with *Netcom*'s reasoning). ALS Scan argues, however, that the better reasoned position, contrary to that held in *Netcom*, is presented in *Playboy Enterprises, Inc. v. Frena*, 839 F. Supp. 1552, 1555-59 (M.D. Fla. 1993), which held a computer bulletin board service provider liable for the copyright infringement when it failed to prevent the placement of plaintiff's copyrighted photographs in its sys-

---

[1]It would appear that ALS Scan's allegations amount more to a claim of contributory infringement in which a defendant, "with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another," *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971), than to a claim of direct infringement.

tem, despite any proof that the provider had any knowledge of the infringing activities.

Although we find the *Netcom* court reasoning more persuasive, the ultimate conclusion on this point is controlled by Congress' codification of the *Netcom* principles in Title II of the DMCA. As the House Report for that Act states,

> The bill distinguishes between direct infringement and secondary liability, treating each separately. This structure is consistent with evolving case law, and appropriate in light of the different legal bases for and policies behind the different forms of liability.

> As to direct infringement, liability is ruled out for passive, automatic acts engaged in through a technological process initiated by another. Thus the bill essentially codifies the result in the leading and most thoughtful judicial decision to date: *Religious Technology Center v. Netcom On-Line Communications Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995). In doing so, it overrules these aspects of *Playboy Enterprises, Inc. v. Frena*, 839 F. Supp. 1552 (M.D. Fla. 1993), insofar as that case suggests that such acts by service providers could constitute direct infringement, and provides certainty that *Netcom* and its progeny, so far only a few district court cases, will be the law of the land.

H.R. Rep. No. 105-551(I), at 11 (1998). Accordingly, we address only ALS Scan's claims brought under the DMCA itself.

### III

For its principal argument, ALS Scan contends that it substantially complied with the notification requirements of the DMCA and thereby denied RemarQ the "safe harbor" from copyright infringement liability granted by that Act. *See* 17 U.S.C. § 512(c)(3)(A) (setting forth notification requirements). It asserts that because its notification was sufficient to put RemarQ on notice of its infringement activities, RemarQ lost its service-provider immunity from

infringement liability. It argues that the district court's application of the DMCA was overly strict and that Congress did not intend to permit Internet providers to avoid copyright infringement liability "merely because a cease and desist notice failed to technically comply with the DMCA."

RemarQ argues in response that it did not have "knowledge of the infringing activity as a matter of law," stating that the DMCA protects it from liability because "ALS Scan failed to identify the infringing works in compliance with the Act, and RemarQ falls within the 'safe harbor' provisions of the Act." It notes that ALS Scan never provided RemarQ or the district court with the identity of the pictures forming the basis of its copyright infringement claim.

These contentions of the parties present the issue of whether ALS Scan complied with the notification requirements of the DMCA so as to deny RemarQ the safe-harbor defense to copyright infringement liability afforded by that Act.

Title II of the DMCA, designated the "Online Copyright Infringement Limitation Act," DMCA, § 201, Pub. L. 105-304, 112 Stat. 2877 (1998) (codified at 17 U.S.C. § 101 note), defines limitations of liability for copyright infringement to which Internet service providers might otherwise be exposed. The Act defines a service provider broadly to include any provider of "online services or network access, or the operator of facilities therefor," including any entity providing "digital online communications, between or among points specified by user, of material of the user's choosing, without modification to the content of the material as sent or received." 17 U.S.C. § 512(k). Neither party to this case suggests that RemarQ is not an Internet service provider for purposes of the Act.

The liability-limiting provision applicable here, 17 U.S.C. § 512(c), gives Internet service providers a safe harbor from liability for "infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider" as long as the service provider can show that: (1) it has neither actual knowledge that its system contains infringing materials nor an awareness of facts or circumstances from which infringement is apparent, or it has expeditiously

removed or disabled access to infringing material upon obtaining actual knowledge of infringement; (2) it receives no financial benefit directly attributable to infringing activity; *and* (3) it responded expeditiously to remove or disable access to material claimed to be infringing after receiving from the copyright holder a notification conforming with requirements of § 512(c)(3). *Id.* § 512(c)(1).[2] Thus, to qualify for this safe harbor protection, the Internet service provider must demonstrate that it has met all three of the safe harbor requirements, and a showing under the first prong — the lack of actual or constructive knowledge — is prior to and separate from the showings that must be made under the second and third prongs.

---

[2] Section 512(c)(1) provides in full:

   (c)   Information residing on systems or networks at direction of users.—

   (1)   In general.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

   (A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

   (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

   (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

   (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

   (C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

In this case, the district court evaluated the adequacy given to RemarQ under the third prong only. Despite the fact the district court stated it was treating RemarQ's motion as a motion to dismiss, rather than as a motion for summary judgment, the court's memorandum opinion fails to mention the allegation made in ALS Scan's complaint that RemarQ had *actual* knowledge of the infringing nature of the two subject newsgroups even before being contacted by ALS Scan, an allegation denied by RemarQ. Clearly, had the court truly been evaluating ALS Scan's complaint under a 12(b)(6) standard of review, it would necessarily have had to accept ALS Scan's allegation as proven for purposes of testing the adequacy of the complaint, *see Eastern Shore Markets, Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000), and consequently been required to rule in favor of ALS Scan under the first prong.

Even if we were to treat the district court's order as disposing of a motion for summary judgment, and not a motion to dismiss, the court still could not, as a matter of law, have resolved the conflicting affidavits about actual knowledge. Resolving whether the court actually treated the motion as one to dismiss or for summary judgment is not necessary, however, because we conclude that ALS Scan substantially complied with the third prong, thereby denying RemarQ its safe harbor defense.

In evaluating the third prong, requiring RemarQ to remove materials following "notification," the district court concluded that ALS Scan's notice was defective in failing to comply strictly with two of the six requirements of a notification — (1) that ALS Scan's notice include "a list of [infringing] works" contained on the RemarQ site and (2) that the notice identify the infringing works in sufficient detail to enable RemarQ to locate and disable them. 17 U.S.C. § 512(c)(3)(A)(ii), (iii).[3]

---

[3]Section 512(c)(3)(A)(ii), (iii) provides:

(3)   Elements of notification.—

   (A)   To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

In support of the district court's conclusion, RemarQ points to the fact that ALS Scan never provided it with a "representative list" of the infringing photographs, as required by § 512(c)(3)(A)(ii), nor did it identify those photographs with sufficient detail to enable RemarQ to locate and disable them, as required by § 512(c)(3)(A)(iii). RemarQ buttresses its contention with the observation that not all materials at the offending sites contained material to which ALS Scan held the copyrights. RemarQ's affidavit states in this regard:

> Some, but not all, of the pictures users have posted on these sites appear to be ALS Scan pictures. It also appears that users have posted other non-ALS Scan's erotic images on these newsgroups. The articles in these newsgroups also contain text messages, many of which discuss the adult images posted on the newsgroups.

ALS Scan responds that the two sites in question — "alt.als" and "alt.binaries.pictures.erotica.als" — were created solely for the purpose of publishing and exchanging ALS Scan's copyrighted images. It points out that the address of the newsgroup is defined by ALS Scan's name. As one of its affidavits states:

> [RemarQ's] subscribers going onto the two offending newsgroups for the purpose of violating [ALS Scan's] copyrights, are actually aware of the copyrighted status of [ALS Scan's] material because (1) each newsgroup has "als" as part of its title, and (2) each photograph belonging to [ALS

* * *

(ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

> Scan] has [ALS Scan's] name and/or the copyright symbol next to it.

> Each of these two newsgroups was created by unknown persons for the illegal purpose of trading the copyrighted pictures of [ALS Scan] to one another without the need for paying to either (1) become members of [ALS Scan's] web site(s) or (2) purchasing the CD-ROMs produced by [ALS Scan].

ALS Scan presses the contention that these two sites serve no other purpose than to distribute ALS Scan's copyrighted materials and therefore, by directing RemarQ to these sites, it has directed RemarQ to a representative list of infringing materials.

The DMCA was enacted both to preserve copyright enforcement on the Internet and to provide immunity to service providers from copyright infringement liability for "passive," "automatic" actions in which a service provider's system engages through a technological process initiated by another without the knowledge of the service provider. H.R. Conf. Rep. No. 105-796, at 72 (1998), *reprinted in* 1998 U.S.C.C.A.N. 649; H.R. Rep. No. 105-551(I), at 11 (1998). This immunity, however, is not presumptive, but granted only to "innocent" service providers who can prove they do not have actual or constructive knowledge of the infringement, as defined under any of the three prongs of 17 U.S.C. § 512(c)(1). The DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence, i.e., at the moment it becomes aware that a third party is using its system to infringe. At that point, the Act shifts responsibility to the service provider to disable the infringing matter, "preserv[ing] the strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." H.R. Conf. Rep. No. 105-796, at 72 (1998), *reprinted in* 1998 U.S.C.C.A.N. 649. In the spirit of achieving a balance between the responsibilities of the service provider and the copyright owner, the DMCA requires that a copyright owner put the service provider on notice in a detailed manner but allows notice by means that comport with the prescribed format only "substantially," rather than perfectly. The Act states: "To be effective under this subsection, a notification

of claimed infringement must be a written communication provided to the designated agent of a service provider that includes *substantially* the following . . . ." 17 U.S.C. § 512(c)(3)(A) (emphasis added). In addition to substantial compliance, the notification requirements are relaxed to the extent that, with respect to multiple works, not all must be identified — only a "representative" list. *See id.* § 512(c)(3)(A)(ii). And with respect to location information, the copyright holder must provide information that is "*reasonably* sufficient" to permit the service provider to "locate" this material. *Id.* § 512(c)(3)(A)(iii) (emphasis added). This subsection specifying the requirements of a notification does not seek to burden copyright holders with the responsibility of identifying every infringing work — or even most of them — when multiple copyrights are involved. Instead, the requirements are written so as to reduce the burden of holders of multiple copyrights who face extensive infringement of their works. Thus, when a letter provides notice equivalent to a list of representative works that can be easily identified by the service provider, the notice substantially complies with the notification requirements.

In this case, ALS Scan provided RemarQ with information that (1) identified two sites created for the sole purpose of publishing ALS Scan's copyrighted works, (2) asserted that virtually all the images at the two sites were its copyrighted material, and (3) referred RemarQ to two web addresses where RemarQ could find pictures of ALS Scan's models and obtain ALS Scan's copyright information. In addition, it noted that material at the site could be identified as ALS Scan's material because the material included ALS Scan's "name and/or copyright symbol next to it." We believe that with this information, ALS Scan substantially complied with the notification requirement of providing a representative list of infringing material as well as information reasonably sufficient to enable RemarQ to locate the infringing material. To the extent that ALS Scan's claims about infringing materials prove to be false, RemarQ has remedies for any injury it suffers as a result of removing or disabling noninfringing material. *See* 17 U.S.C. § 512(f), (g).

Accordingly, we reverse the district court's ruling granting summary judgment in favor of RemarQ on the basis of ALS Scan's non-compliance with the notification provisions of 17 U.S.C. § 512(c)(3)(A)(ii) and (iii). Because our ruling only removes the safe

harbor defense, we remand for further proceedings on ALS Scan's copyright infringement claims and any other affirmative defenses that RemarQ may have.

## IV

ALS Scan also appeals the district court's decision not to enter summary judgment on its behalf with respect to its infringement claim. Because there is a dispute as to several material facts, however, we affirm the district court's ruling on ALS Scan's motion for summary judgment. If ALS Scan is able to prove that in fact the offending newsgroups' "sole purpose" is infringement of ALS Scan's copyrights, it may be entitled to a remedy. However, because it is contested both that such is, in fact, the "sole" purpose of the newsgroups, and that "virtually all" the images posted in the newsgroups are infringing, we are unable to come to any legal conclusions. Final disposition must await further development of the record and further proceedings.

## V

Accordingly, for the reasons given, we reverse the district court's decision to grant summary judgment in favor of RemarQ, affirm the district court's decision not to grant summary judgment in favor of ALS Scan, and remand this case for further proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*