Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge MICHAEL joined. Judge GREGORY wrote a dissenting opinion.
OPINION
NIEMEYER, Circuit Judge:
CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively “CoStar”), a copyright owner of numerous photographs of commercial real estate, commenced this copyright infringement action against Lo-opNet, Inc., an Internet service provider, for direct infringement under §§ 501 and 106 of the Copyright Act because CoStar’s copyrighted photographs were posted by LoopNet’s subscribers on LoopNet’s website. CoStar contended that the photographs were copied into LoopNet’s computer system and that LoopNet therefore was a copier strictly liable for infringement of CoStar’s rights under § 106, regardless of whether LoopNet’s role was passive when the photographs were copied into its system.
Relying on Religious Technology Center v. Netcom On-Line Communication Services, Inc., 907 F.Supp. 1361 (N.D.Cal.1995), the district court entered summary judgment in favor of LoopNet on the claim of direct infringement under § 106. We agree with the district court. Because LoopNet, as an Internet service provider, is simply the owner and manager of a system used by others who are violating CoStar’s copyrights and is not an actual duplicator itself, it is not directly liable for copyright infringement. We therefore affirm.
I
CoStar is a national provider of commercial real estate information, and it claims to have collected the most comprehensive database of information on commercial real estate markets and commercial properties in the United States and the United Kingdom. Its database includes a large collection of photographs of commercial properties, and CoStar owns the copyright in the vast majority of these photographs. CoStar makes its database, including photographs, available to customers through the Internet and otherwise, and each customer agrees not to post CoStar’s photographs *547 on its own website or on the website of a third party.
LoopNet is an Internet service provider (“ISP”) whose website allows subscribers, generally real estate brokers, to post listings of commercial real estate on the Internet. It claims that its computer system contains over 100,000 customer listings of commercial real estate, including approximately 33,000 photographs, and that it was, during the district court proceedings, adding about 2200 listings each day, 250 of which include photographs. LoopNet does not post real estate listings on its own account. Rather it provides a “web hosting service that enables users who wish to display real estate over the Internet to post listings for those properties on Loop-Net’s web site.”
When using LoopNet’s services, a subscriber fills out a form and agrees to “Terms and Conditions” that include a promise not to post copies of photographs without authorization. If the subscriber includes a photograph for a listing, it must fill out another form and agree again to the “Terms and Conditions,” along with an additional express warranty that the subscriber has “all necessary rights and authorizations” from the copyright owner of the photographs. The subscriber then uploads the photographs into a folder in LoopNet’s system, and the photograph is transferred to the RAM of one of Loop-Net’s computers for review. A LoopNet employee then cursorily reviews the photograph (1) to determine whether the photograph in fact depicts commercial real estate, and (2) to identify any obvious evidence, such as a text message or copyright notice, that the photograph may have been copyrighted by another. If the photograph fails either one of these criteria, the employee deletes the photograph and notifies the subscriber. Otherwise, the employee clicks an “accept” button that prompts LoopNet’s system to associate the photograph with the web page for the property listing, making the photograph available for viewing.
Beginning in early 1998, CoStar became aware that photographs for which it held copyrights were being posted on Loop-Net’s website by LoopNet’s subscribers. When CoStar informed LoopNet of the violations, LoopNet removed the photographs. In addition, LoopNet instituted and followed a policy of marking properties to which infringing photographs had been posted so that if other photographs were posted to that property, LoopNet could inspect the photographs side-by-side to make sure that the new photographs were not the infringing photographs. By late summer 1999, CoStar had discovered 112 infringing photographs on LoopNet’s website, and by September 2001, it had found over' 300. At that time, LoopNet had in its system about 33,000 photographs posted by its subscribers.
CoStar commenced this action in September 1999 against Loop-Net, alleging copyright infringement, violation of the Lanham Act, and several state-law causes of action. On cross-motions for summary judgment, the district court concluded that LoopNet had not engaged in direct infringement under the Copyright Act. It left open, however, CoStar’s claims that LoopNet might have contributorily infringed CoStar’s copyrights and that LoopNet was not entitled to the “safe harbor” immunity provided by the Digital Millennium Copyright Act, 17 U.S.C. § 512. When the parties stipulated to the dismissal of all claims except the district court’s summary judgment in favor of Loop-Net on direct infringement, the district court entered final judgment on that issue in favor of LoopNet. From entry of the judgment, CoStar noticed this appeal.
*548 II
CoStar contends principally that the district court erred in providing LoopNet “conclusive immunity,” as a “ ‘passive’ provider of Internet” services, from strict liability for its hosting of CoStar’s copyrighted pictures on LoopNet’s website. The district court based its decision on the reasoning of Religious Technology Center v. Netcom On-Line Communication Services, Inc., 907 F.Supp. 1361 (N.D.Cal.1995) (“Netcom ”), which held that an ISP serving as a passive conduit for copyrighted material is not liable as a direct infringer. CoStar asserts that LoopNet is strictly liable for infringement of CoStar’s rights protected by § 106 of the Copyright Act. According to CoStar, any immunity for the passive conduct of an ISP such as LoopNet must come from the safe harbor immunity provided by the Digital Millennium Copyright Act (“DMCA”), if at all, because the DMCA codified and supplanted the Netcom holding. Because Loop-Net could not meet the conditions for immunity under the DMCA as to many of the copyrighted photographs, LoopNet accordingly would be liable under CoStar’s terms for direct copyright infringement for hosting web pages containing the infringing photos.
Stated otherwise, CoStar argues (1) that the Netcom decision was a pragmatic and temporary limitation of traditional copyright liability, which would otherwise have held ISPs strictly liable, and that in view of the enactment of the DMCA, Netcom’s limitation is no longer necessary; (2) that Congress considered Netcom in enacting the DMCA, codifying its principles and thereby supplanting and preempting Net-com as the only exemption from liability for direct infringement; and (3) that because LoopNet cannot satisfy the conditions of the DMCA, it remains strictly liable for direct infringement under §§ 106 and 501 of the Copyright Act. We will address CoStar’s points, determining first the nature and applicability of the Netcom decision and second the impact of the DMCA on Netcom.
A
In Netcom, the court held, among other things, that neither the ISP providing Internet access, nor the bulletin board service storing the posted material, was liable for direct copyright infringement under § 106 when a subscriber posted copyrighted materials on the Internet. The court observed that “[a]lthough copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant’s system is merely used to use a copy by a third party.” 907 F.Supp. at 1370. In responding to the argument that the ISP’s computers stored and thereby “copied” copyrighted material on its system for a period of days in rendering its service, the court stated:
Where the infringing subscriber is clearly directly liable for the same act, it does not make sense to adopt a rule that would lead to the liability of countless parties whose role in the infringement is nothing more than setting up and operating a system that is necessary for the functioning of the Internet.... The court does not find workable a theory of infringement that would hold the entire Internet liable for activities that cannot reasonable be deterred. Billions of bits of data flow through the Internet and are necessarily stored on servers throughout the network and it is thus practically impossible to screen out infringing bits from noninfringing bits. Because the court cannot see any meaningful distinction (without regard to knowledge) between what Netcom did and what every other Usenet server *549 does, the court finds that Netcom cannot be held liable for direct infringement.
Id. at 1372-73.
CoStar argues, in view of the court’s explanation, that the Netcom decision was driven by expedience and that its holding is inconsistent with the established law of copyright, as represented by Playboy Enterprises, Inc. v. Frena, 839 F.Supp. 1552 (M.D.Fla.1993) (holding an ISP strictly liable for illegal copying on its computer system). It maintains that the court made a policy judgment based not on what the law was but on the fact that the Internet would have been crippled as a medium if preexisting law had been applied. It argues further that since the enactment of the DMCA in 1998, the problem identified in Netcom has been solved by the DMCA, and consequently there is no longer any need for the courts to continue to uphold this “special exemption” from § 106 liability for ISPs.
While the court in Netcom did point out the dramatic consequences of a decision that would hold ISPs strictly liable for transmitting copyrighted materials through their systems without knowledge of what was being transmitted, the court grounded its ruling principally on its interpretation of § 106 of the Copyright Act as implying a requirement of “volition or causation” by the purported infringer. This construction is one for which we have already indicated our preference over the contrary decision described in Frena. See ALS Scan, Inc. v. RemarQ Communities, Inc., 239 F.3d 619, 622 (4th Cir.2001). There are several reasons to commend this approach.
“[T]he Copyright Act grants the copyright holder ‘exclusive’ rights to use and to authoi’ize the use of his work in five qualified ways, including reproduction of the copyrighted work in copies.” Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 432-33, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). And it provides that “[a]nyone who violates any of the exclusive rights of the copyright owner ... is an infringer of the copyright.” 17 U.S.C. § 501. Stated at a general level, “[t]o establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.” Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). A direct infringer has thus been characterized as one who “trespasses into [the copyright owner’s] exclusive domain” established in § 106, subject to the limitations of §§ 107 through 118. Sony, 464 U.S. at 433, 104 S.Ct. 774; see also 17 U.S.C. § 106 (specifying limitations).
While the Copyright Act does not require that the infringer know that he is infringing or that his conduct amount to a willful violation of the copyright owner’s rights, it nonetheless requires conduct by a person who causes in some meaningful way an infringement. Were this not so, the Supreme Court could not have held, as it did in Sony, that a manufacturer of copy machines, possessing constructive knowledge that purchasers of its machine may be using them to engage in copyright infringement, is not strictly liable for infringement. 464 U.S. at 439-42, 104 S.Ct. 774. This, of course, does not mean that a manufacturer or owner of machines used for copyright violations could not have some indirect liability, such as contributory or vicarious liability. But such extensions of liability would require a showing of additional elements such as knowledge coupled with inducement or supervision coupled with a financial interest in the illegal copying.
The Copyright Act does not specifically provide for such extended liability, *550 instead describing only the party who actually engages in infringing conduct — the one who directly violates the prohibitions. Yet under general principles of law, vicarious liability or contributory liability may be imposed:
The absence of such express language in the copyright statute does not preclude the imposition of liability for copyright infringements on certain parties who have not themselves engaged in the infringing activity. For vicarious liability is imposed in virtually all areas of the law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just to hold one individual accountable for the actions of another.
Sony, 464 U.S. at 435, 104 S.Ct. 774. Under a theory of contributory infringement, “one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another” is liable for the infringement, too. Gershwin Publishing Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir.1971) (footnote omitted). Under a theory of vicarious liability, a defendant who “has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities” is similarly liable. Id.
But to establish direct liability under §§ 501 and 106 of the Act, something more must be shown than mere ownership of a machine used by others to make illegal copies. There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner. The Netcom court described this nexus as requiring some aspect of volition or causation. 907 F.Supp. at 1370. Indeed, counsel for both parties agreed at oral argument that a copy machine owner who makes the machine available to the public to use for copying is not, without more, strictly liable under § 106 for illegal copying by a customer. The ISP in this case is an analogue to the owner of a traditional copying machine whose customers pay a fixed amount per copy and operate the machine themselves to make copies. When a customer duplicates an infringing work, the owner of the copy machine is not considered a direct infringer. Similarly, an ISP who owns an electronic facility that responds automatically to users’ input is not a direct infringer. If the Copyright Act does not hold the owner of the copying machine liable as a direct infringer when its customer copies infringing material without knowledge of the owner, the ISP should not be found liable as a direct in-fringer when its facility is used by a subscriber to violate a copyright without intervening conduct of the ISP..
Moreover, in the context of the conduct typically engaged in by an ISP, construing the Copyright Act to require some aspect of volition and meaningful causation — as distinct from passive ownership and management of an electronic Internet facility — receives additional support from the Act’s concept of “copying.” A violation of § 106 requires copying or the making of copies. See 17 U.S.C. § 106(1), (3); id. § 102(a); Feist Publications, 499 U.S. at 361, 111 S.Ct. 1282. And the term “copies” refers to “material objects ... in which a work is fixed.” 17 U.S.C. § 101 (“Definitions”) (emphasis added). A work is “fixed” in a medium when it is embodied in a copy “sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.” Id. (emphasis added). When an electronic infrastructure is designed and managed as a conduit of information and data that con *551 nects users over the Internet, the owner and manager of the conduit hardly “copies” the information and data in the sense that it fixes a copy in its system of more than transitory duration. Even if the information and data are “downloaded” onto the owner’s RAM or other component as part of the transmission function, that downloading is a temporary, automatic response to the user’s request, and the entire system functions solely to transmit the user’s data to the Internet. Under such an arrangement, the ISP provides a system that automatically transmits users’ material but is itself totally indifferent to the material’s content. In this way, it functions as does a traditional telephone company when it transmits the contents of its users’ conversations. While temporary electronic copies may be made in this transmission process, they would appear not to be “fixed” in the sense that they are “of more than transitory duration,” and the ISP therefore would not be a “copier” to make it directly liable under the Copyright Act. With additional facts, of course, an ISP could become indirectly liable.
In concluding that an ISP has not itself fixed a copy in its system of more than transitory duration when it provides an Internet hosting service to its subscribers, we do not hold that a computer owner who downloads copyrighted software onto a computer cannot infringe the software’s copyright. See, e.g., MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 518-19 (9th Cir.1993). When the computer owner downloads copyrighted software, it possesses the software, which then functions in the service of the computer or its owner, and the copying is no longer of a transitory nature. See, e.g., Vault Corp. v. Quaid Software Ltd., 847 F.2d 255, 260 (5th Cir.1988). “Transitory duration” is thus both a qualitative and quantitative characterization. It is quantitative insofar as it describes the period during which the function occurs, and it is qualitative in the sense that it describes the status of transition. Thus, when the copyrighted software is downloaded onto the computer, because it may be used to serve the computer or the computer owner, it no longer remains transitory. This, however, is unlike an ISP, which provides a system that automatically receives a subscriber’s infringing material and transmits it to the Internet at the instigation of the subscriber.
Accordingly, we conclude that Netcom made a particularly rational interpretation of § 106 when it concluded that a person had to engage in volitional conduct — specifically, the act constituting infringement — to become a direct infringer. As the court in Netcom concluded, such a construction of the Act is especially important when it is applied to cyberspace. There are thousands of owners, contractors, servers, and users involved in the Internet whose role involves the storage and transmission of data in the establishment and maintenance of an Internet facility. Yet their conduct is not truly “copying” as understood by the Act; rather, they are conduits from or to would-be copiers and have no interest in the copy itself. See Doe v. GTE Corp., 347 F.3d 655, 659 (7th Cir.2003) (“A web host, like a delivery service or phone company, is an intermediary and normally is indifferent to the content of what it transmits”). To conclude that these persons are copyright infringers simply because they are involved in the ownership, operation, or maintenance of a transmission facility that automatically records material — copyrighted or not — would miss the thrust of the protections afforded by the Copyright Act. In rejecting even contributory infringement in some of such circumstances, the Supreme Court stated:
*552 The staple article of commerce doctrine must strike a balance between a copyright holder’s legitimate demand for effective — not merely symbolic — protection of the statutory monopoly, and the rights of others freely to engage in substantially unrelated areas of commerce.
Sony, 464 U.S. at 442, 104 S.Ct. 774. We thus find it an overstatement by CoStar to argue that Netcom represented the adoption of a new “special liability-limiting rule for Internet servers.”
B
CoStar rests its position not only on the marginalization of the Netcom holding, but also on the assertion that the DMCA rendered Netcom no longer necessary — indeed, even codified and preempted Netcom — by imposing an exclusive safe harbor for ISPs that fulfill the conditions of the DMCA. CoStar argues that because the DMCA supplanted Netcom, LoopNet must rely for its defense exclusively on the immunity conferred by the DMCA. This argument, however, is belied by the plain language of the DMCA itself.
The DMCA was enacted as § 512 of the Copyright Act. The relevant subsection of § 512 provides limitations on liability “for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service for the [Internet] service provider” if the ISP lacks scienter about a copyright violation by a user, does not profit directly from the violation, and responds expeditiously to a proper notice of the violation. See 17 U.S.C. § 512(c)(1). In order to enjoy the safe harbor provided by § 512(c), the ISP must also fulfill other conditions imposed by the DMCA. See id. § 512(c), (i). Even though the DMCA was designed to provide ISPs with a safe harbor from copyright liability, nothing in the language of § 512 indicates that the limitation on liability described therein is exclusive. Indeed, another section of the DMCA provides explicitly that the DMCA is not exclusive:
Other defenses not affected. — The failure of a service provider’s conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider’s conduct is not infringing under this title or any other defense.
Id. § 512(Z). Thus the statute specifically provides that despite a failure to meet the safe-harbor conditions in § 512(c) and (i), an ISP is still entitled to all other arguments under the law — whether by way of an affirmative defense or through an argument that conduct simply does not constitute a prima facie case of infringement under the Copyright Act.
Given that the statute declares its intent not to “bear adversely upon” any of the ISP’s defenses under law, including the defense that the plaintiff has not made out a prima facie case for infringement, it is difficult to argue, as CoStar does, that the statute in fact precludes ISPs from relying on an entire strain of case law holding that direct infringement must involve conduct having a volitional or causal aspect. Giving such a construction to the DMCA would in fact “bear adversely upon the consideration” of this defense, in direct contravention of § 512(J). We conclude that in enacting the DMCA, Congress did not preempt the decision in Netcom nor foreclose the continuing development of liability through court decisions interpreting §§ 106 and 501 of the Copyright Act.
CoStar advances the additional argument that because “Congress ‘codified’ Netcom in the DMCA ... it can only be to the DMCA that we look for enforcement of those principles.” The brief of several *553 amici echoes this point with the assertion that “if Congress intended Netcom to survive the DMCA, there would have been no need to enact the statute in the first place.” CoStar and the amici, however, have this point of statutory construction exactly backward. When Congress codifies a common-law principle, the common law remains not only good law, but a valuable touchstone for interpreting the statute, unless Congress explicitly states that it intends to supplant the common law. “The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific.” Midlantic Nat’l Bank v. N.J. Dep’t of Envtl. Prot., 474 U.S. 494, 501, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) (citing Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 266-67, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979)); Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 549, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (observing that § 107 of the Copyright Act, articulating the elements of the fair use defense, “ ‘restatefs] [not changes] pre-existing judicial doctrine’ ”) (quoting H.R.Rep. No. 94-1476, at 66 (1976)). Thus, without explicit statutory instructions, the cases drawn upon by Congress in writing legislation are not supplanted by the legislation, and courts may — indeed should — continue to look to these cases for guidance.
CoStar’s argument that the DMCA supplanted and preempted Netcom is further undermined by the DMCA’s legislative history. Congress actually expressed its intent that the courts would continue to determine how to apply the Copyright Act to the Internet and that the DMCA would merely create a floor of protection for ISPs. After citing the conflicting decisions in Netcom and Frena, the Senate Committee on the Judiciary explained that “rather than embarking upon a wholesale clarification of these doctrines, the Committee decided to leave current law in its evolving state and, instead, to create a series of ‘safe harbors,’ for certain common activities of service providers.” S.Rep. No. 105-190, at 19 (1998). The Ninth Circuit has found this language persuasive, citing it in finding that “[t]he DMCA did not simply rewrite copyright law for the on-line world.” Ellison v. Robertson, 357 F.3d 1072, 1077 (9th Cir.2004). Furthermore, the final conference report supports this passage, stating:
As provided in subsection (l), Section 512 is not intended to imply that a service provider is or is not liable as an infringer either for conduct that qualifies for a limitation of liability or for conduct that fails to so qualify. Rather, the limitations of liability apply if the provider is found to be liable under existing principles of law.
H.R. Conf. Rep. No. 105-796, at 73 (1998), reprinted in 1998 U.S.C.C.A.N. 639, 649. Thus the DMCA was intended not to change the “evolving” doctrines on ISP liability for copyright infringement, which included Netcom and Frena, but to offer a certain safe harbor for ISPs. Courts were left free to continue to construe the Copyright Act in deciding the scope and nature of prima facie liability. The legislative “compromise” repeatedly invoked by CoStar and its amici was that Congress would not end the debate by importing and fixing copyright infringement liability in the form articulated by Netcom, but rather would provide a limited safe harbor immediately necessary to ISPs, and allow the courts to continue defining what constitutes a prima facie case of copyright infringement against an ISP.
CoStar challenges our conclusion by relying also on a passage from ALS Scan, which is concededly ambiguous when taken out of context, where we wrote:
*554 Although we find the Netcom court reasoning more persuasive, the ultimate conclusion on this point is controlled by Congress’ codification of the Netcom principles in Title II of the DMCA. As the House Report for that Act states,
The bill distinguishes between direct infringement and secondary liability, treating each separately.
This structure is consistent with evolving case law, and appropriate in light of the different legal bases for and policies behind the different forms of liability.
As to direct infringement, liability is ruled out for passive, automatic acts engaged in through a technological process initiated by another. Thus the bill essentially codifies the result in the leading and most thoughtful judicial decision to date: Religious Technology Center v. Netcom OnLine Communication Services, Inc., 907 F.Supp. 1361 (N.D.Cal.1995). In doing so, it overrules these aspects of Playboy Enterprises, Inc. v. Frena, 839 F.Supp. 1552 (M.D.Fla.1993), insofar as that case suggests that such acts by service providers could constitute direct infringement, and provides certainty that Netcom and its progeny, so far only a few district court cases, will be the law of the land.
H.R.Rep. No. 105-551(1), at 11 (1998). Accordingly, we address only ALS Scan’s claims brought under the DMCA itself.
ALS Scan, 239 F.3d at 622. This portion of legislative history was referring to an earlier version of the legislation, in which the entire holding of Netcom was imported.* The distinction between this earlier bill and the legislation as ultimately passed was not relevant to the holding in ALS Scan, where we denied summary judgment to both parties and remanded for the district court to determine facts that would be relevant to whether the defendant had committed contributory or vicarious infringement, such as whether the defendant system’s “‘sole purpose’ [was] infringement of ALS Scan’s copyrights,” and *555 whether “ ‘virtually all’ the images posted in the newsgroups [were] infringing.” Id. at 626. Indeed, we noted that “[i]t would appear that ALS Scan’s . allegations amount more to a claim of contributory infringement ... than to a claim of direct infringement.” Id. at 621 n. 1.
With respect to the issue of what creates liability for direct infringement, the distinction between the two bills is more important. The earlier version of the bill was meant to incorporate all of Netcom’s protections, whereas the final law reflected the abovementioned compromise between the earlier version and the concerns of copyright-holders. Congress would enact certain safe-harbor provisions absolutely necessary to the immediate survival of ISPs, while courts would continue to consider the question of whether passive ISPs could ever be directly liable for violations of copyright committed .using their systems.
It is clear that Congress intended the DMCA’s safe harbor for ISPs to be a floor, not a ceiling, of protection. Congress said nothing about whether passive ISPs should ever be held strictly liable as direct in-fringers or whether plaintiffs suing ISPs should instead proceed under contributory theories. The DMCA has merely added a second step to assessing infringement liability for Internet service providers, after it is determined whether they are infring-ers in the first place under the preexisting Copyright Act. Thus, the DMCA is irrelevant to determining what constitutes a pri-ma facie case of copyright infringement.
At bottom, we hold that ISPs, when passively storing material at the direction of users in order to make that material available to other users upon their request, do not “copy” the material in direct violation of § 106 of the Copyright Act. Agreeing with the analysis in Netcom, we hold that the automatic copying, storage, and transmission of copyrighted materials, when instigated by others, does not render an ISP strictly liable for copyright infringement under §§ 501 and 106 of the Copyright Act. An ISP, however, can become liable indirectly upon a showing of additional involvement sufficient to establish a contributory or vicarious violation of the Act. In that case, the ISP could still look to the DMCA for a safe harbor if it fulfilled the conditions therein.
Ill
CoStar contends that even under Netcom’s construction of copyright infringement liability for ISPs, LoopNet’s conduct in this case is more than passive, in that LoopNet screens photographs posted by its subscribers. In CoStar’s opinion, this screening process renders LoopNet liable for direct copyright infringement.
LoopNet, like other ISPs, affords its subscribers an Internet-based facility on which to post materials, but the materials posted are of a type and kind selected by the subscriber and at a time initiated by the subscriber. Similarly, users who wish to access a subscriber’s information may do so without intervention from LoopNet. A subscriber seeking to post a listing on LoopNet’s website containing only text fills out a form and agrees to LoopNet’s “Terms and Conditions,” which include the obligation to respect others’ copyrights. Once the subscriber has filled out the form and agreed to the “Terms and Conditions,” an identification number is automatically assigned to the listing, and a web page containing the listing and the identification number is automatically created. The web page is then hosted on LoopNet’s website to be viewed by users who request the listing. CoStar does not contend that Lo-opNet’s activity in signing up subscribers with only textual property listings is anything other than passive.
*556 To argue that LoopNet loses its status as a passive ISP and therefore becomes liable for direct copyright infringement, CoStar focuses on LoopNet’s gatekeeping practice with respect to photographs. To add a photograph to a listing, the subscriber must fill out another form and again agree to the “Terms and Conditions.” After expressly warranting that he has “all necessary rights and authorizations from the ... copyright owner of the photographs,” the subscriber uploads the photograph into a folder in LoopNet’s system. The photograph is then transferred to the RAM of one of LoopNet’s computers for review. A LoopNet employee reviews the photo for two purposes: (1) to block photographs that do not depict commercial real estate, and (2) to block photographs with obvious signs that they are copyrighted by a third party. If the photograph carries a copyright notice or represents subject matter other than commercial real estate, the employee deletes the photograph; otherwise, she clicks a button marked “accept,” and LoopNet’s system automatically associates the photograph with the subscriber’s web page for the property listing, making it available for use. Unless a question arises, this entire process takes “a few seconds.”
Although LoopNet engages in volitional conduct to block photographs measured by two grossly defined criteria, this conduct, which takes only seconds, does not amount to “copying,” nor does it add volition to LoopNet’s involvement in storing the copy. The employee’s look is so cursory as to be insignificant, and if it has any significance, it tends only to lessen the possibility that LoopNet’s automatic electronic responses will inadvertently enable others to trespass on a copyright owner’s rights. In performing this gatekeeping function, Loop-Net does not attempt to search out or select photographs for duplication; it merely prevents users from duplicating certain photographs. To invoke again the analogy of the shop with the copy machine, LoopNet can be compared to an owner of a copy machine who has stationed a guard by the door to turn away customers who are attempting to duplicate clearly copyrighted works. LoopNet has not by this screening process become engaged as a “copier” of copyrighted works who can be held liable under §§ 501 and 106 of the Copyright Act.
To the extent that LoopNet’s intervention in screening photographs goes further than the simple gatekeeping function described above, it is because of CoStar’s complaints about copyright violations. Whenever CoStar has complained to Loop-Net about a particular photograph, Loop-Net has removed the photograph, and the property listing with which the photograph was associated has been marked. The next time the user tries to post a photograph to accompany that listing, LoopNet conducts a manual side-by-side review to make sure that the user is not reposting the infringing photograph. CoStar and other copyright holders benefit significantly from this type of response. If they find such conduct by an ISP too active, they can avoid it by adding a copyright notice to their photographs, which CoStar does not do. CoStar can hardly request LoopNet to prevent its users from infringing upon particular unmarked photographs and then subsequently seek to hold LoopNet liable as a direct infringer when Loop-Net complies with CoStar’s request.
In short, we do not conclude that Loop-Net’s perfunctory gatekeeping process, which furthers the goals of the Copyright Act, can be taken to create liability for LoopNet as a direct infringer when its conduct otherwise does not amount to direct infringement.
*557 For the reasons given, we affirm the judgment of the district court.

AFFIRMED

 The earlier' version of the bill, to which this language referred, read:
(a) Limitation.... [A] provider shall not be liable for—
(1) direct infringement, based solely on the intermediate storage and transmission of material through a system or network controlled or operated by or for that provider, if—
(A) the transmission was initiated by another person;
(B) the storage and transmission is carried out through an automatic technological process, without any selection of that material by the provider; and
(C) no copy of the material thereby made by the provider is maintained on the provider’s system or network in a manner ordinarily accessible to anyone other than the recipients anticipated by the person who initiated the transmission, and no such copy is maintained on the system or network in a manner ordinarily accessible to such recipients for a longer period than is reasonably necessary for the transmission. ...
H.R.Rep. No. 105-551, pt. 1, at 7-8 (1998). These provisions most closely resemble those codified at 17 U.S.C. § 512(a), but the final legislation differs in several ways that are important to this case. First, the law as enacted draws no distinction between direct and indirect liability for infringement. Second, the earlier version does not appear to address how to treat material for which the ISP acts as a host server, allowing users to post the information in anticipation that other users will request the information to be transmitted to them, as LoopNet and many other ISPs do. In the final legislation, "[¡Information residing on systems or networks at [the] direction of users” is specifically addressed. 17 U.S.C. § 512(c). Finally, unlike the earlier version, which would have exempted ISPs unconditionally for direct liability for automatic processes, the enacted law requires ISPs to fulfill certain "[c]onditions for eligibility” for the safe harbors. Id. § 512(i).